WO                                                                                              JDN

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Richard Johnson,                    )   No. CV 12-0539-PHX-GMS (DKD)
                                    )
            Plaintiff,              )   **ORDER**
                                    )
vs.                                 )
                                    )
Sergeant Juvera, et al.,            )
                                    )
            Defendants.             )
                                    )
_____)

Plaintiff Richard Johnson brought this civil rights action under 42 U.S.C. § 1983 against various Arizona Department of Corrections (ADC) employees (Doc. 1). Before the Court is Defendants' Motion to Dismiss for failure to exhaust administrative remedies (Doc. 12), which Plaintiff opposes (Doc. 19).

The Court will deny Defendants' motion.

**I.    Background**

Plaintiff's claim arose during his confinement at the Arizona State Prison Complex-Lewis, Rast Unit (Doc. 1 at 1). He named the following Defendants: (1) Sergeant Juvera; (2) Correctional Officer (CO) II Jackson; (3) CO II Davis Cruz; (4) CO II Larry Brown; and (5) CO II Mark Reed (id. at 1A-2A).

In his Complaint, Plaintiff alleged that Juvera and Johnson were deliberately indifferent to a substantial risk of harm when they allowed inmates to pass through a metal detector after setting off the alarm (id. at 5). Plaintiff stated that Jackson was present when

an inmate sounded an alarm twice on June 16, 2010. According to Plaintiff, Jackson admitted on audio recordings that he did not search inmates who sounded the metal detector alarm. Plaintiff averred that the inmate who sounded the alarm on June 16, 2010, stabbed Plaintiff that same day (id.).

Plaintiff alleged that Cruz and Brown were deliberately indifferent when they allowed inmates from different units, who were to be kept separate and on lock down, to be out in the recreation yard (id. at 5-5A). Plaintiff alleged that Reed was deliberately indifferent when, as the tower officer, he was inattentive to his duties and permitted inmates onto the yard although they were to be separated and locked in their cells. Plaintiff claimed that Reed admitted on audio recordings that he was not familiar with the operation of the unit (id. at 5A).

Plaintiff contends that, as a result of Defendants' actions and inactions, on June 16, 2010, he was stabbed by an inmate who triggered the metal detector but was permitted to pass through without an additional search. Plaintiff states that his injuries required a dozen staples to close his upper chest and the area below his left arm pit (id. at 5-5C).[1]

Defendants now move to dismiss Plaintiff's claims on the ground that he failed to exhaust administrative remedies as required under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) (Doc. 12).[2]

## II.    Exhaustion Legal Standard

Under the PLRA, a prisoner must exhaust available administrative remedies before bringing a federal action. See 42 U.S.C. § 1997e(a); Griffin v. Arpaio, 557 F.3d 1117, 1119 (9th Cir. 2009). Exhaustion is required for all suits about prison life, Porter v. Nussle, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, Booth v. Churner, 532 U.S. 731, 741 (2001). A prisoner must complete the

---

[1]Plaintiff's allegations are set forth in Count III of his Complaint (Doc. 1 at 5). On screening, the Court dismissed Counts I and II (Doc. 5).

[2]Juvera, Reed, Brown, and Cruz move for dismissal (Doc. 12). Jackson has not been served (see Doc. 20).

1   administrative review process in accordance with the applicable rules.  See Woodford v.

2   Ngo, 548 U.S. 81, 92 (2006).

3       Exhaustion is an affirmative defense. Jones v. Bock, 549 U.S. 199, 212 (2007).  Thus,

4   the defendant bears the burden of raising and proving the absence of exhaustion.  Wyatt v.

5   Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  There can be no absence of exhaustion unless

6   a defendant demonstrates that applicable relief remained available in the grievance process.

7   Brown v. Valoff, 422 F.3d 926, 936-37 (9th Cir. 2005).  Because exhaustion is a matter of

8   abatement in an unenumerated Rule 12(b) motion, a court may look beyond the pleadings to

9   decide disputed issues of fact.  Wyatt, 315 F.3d at 1119-20.  And when considering disputed

10  issues of fact, a court has broad discretion as to the method used in resolving the dispute

11  because "there is no right of jury trial" as to an issue arising in a pre-answer motion.  Ritza

12  v. Int'l Longshoremen's & Warehousemen's Union, 837 F.2d 365, 369 (9th Cir. 1988)

13  (quotation omitted).  If a court finds that the plaintiff failed to exhaust administrative

14  remedies, the proper remedy is dismissal without prejudice.  Wyatt, 315 F.3d at 1120.

15  **III.   Parties' Contentions**

16          **A.   Defendants' Motion**

17      In support of their motion, Defendants submit the declaration of Michael McCarville,

18  the Lewis Complex, Rast Unit Deputy Warden (Doc. 12, Ex. A, McCarville Decl. ¶ 1).

19  McCarville states that Department Order (DO) 802, modified by Director's Instruction (DI)

20  287, sets forth the procedures governing the inmate grievance system (id. ¶¶ 3-4).  The

21  attached copies of DO 802 and DI 287 describe the following steps in the grievance process:

22  (1) an inmate must try to resolve his complaint through informal means (id., Ex. 1, DO

23  802.02 § 1.1); (2) if not resolved, the inmate may file an informal complaint by inmate letter

24  within 10 days after the issue arises (id., DO 802.02 § 1.2); (3) if not satisfied with the

25  inmate-letter response, the inmate may file a formal grievance to the CO IV Unit Grievance

26  Coordinator (id., DO 802.02 § 1.4, DO 802.03 §§ 1.1-1.3); (4) if not satisfied with the

27  Deputy Warden's response to the formal grievance, the inmate may file a first-level appeal

28

1    to the Warden (id., DO 802.02.04 § 1.1); and (5) if not satisfied with that response, the final

2    step is an appeal to the ADC Director (id., DO 802.05 § 1.1, 1.8).

3         McCarville states that these grievance procedures address any inmate complaint

4    related to any aspect of institutional life or condition of confinement (id., Ex. A, McCarville

5    Decl. ¶ 4).  He notes that these grievance procedures do not serve as a duplicate appeal

6    process for those areas with independent appeal processes, such as the Disciplinary Hearing

7    Process, Protective Segregation, and Classification (id.).  McCarville avers that Plaintiff was

8    housed at the Rast Unit until June 17, 2010; however, a review of the Rast Unit inmate

9    grievance log reveals no record of an inmate grievance filed by Plaintiff regarding a June 16,

10   2010 stabbing (id. ¶¶ 6-7).

11        Defendants also submit the declarations of Carol Pinson, Grievance Coordinator at

12   the Eyman Complex, Special Management Unit (SMU) I, and Duane Riker, Grievance

13   Coordinator at the Eyman Complex, Browning Unit (id., Ex. B, Pinson Decl. ¶ 1; Ex. C,

14   Riker Decl. ¶ 1).  They state that Plaintiff was housed at SMU I from June 17-October 10,

15   2010, and housed at the Browning Unit from October 10, 2010-February 17, 2011 (id., Ex.

16   B, Pinson Decl. ¶ 6; Ex. C, Riker Decl. ¶ 6).  Pinson and Riker explain that, as Grievance

17   Coordinators, they maintain a log of all processed grievances (id., Ex. B, Pinson Decl. ¶ 5;

18   Ex. C, Riker Decl. ¶ 5).  Pinson avers that she reviewed the SMU I inmate grievance log and

19   found no inmate grievance filed by Plaintiff during his confinement there (id., Ex. B, Pinson

20   Decl. ¶ 7).  Riker avers that he reviewed the Browning Unit inmate grievance log for the

21   period of Plaintiff's confinement there and found just one grievance, dated December 22,

22   2010, that concerned missing property (id., Ex. C, Riker Decl. ¶ 7).

23        In their motion, Defendants rely on this evidence to argue that Plaintiff failed to

24   exhaust available remedies for his claim (Doc. 12 at 7).  They also note that in his Complaint,

25   Plaintiff confirmed that he did not submit a grievance appeal to the Director's level (id.,

26   citing Doc. 1 at 5).

27

28

1

### B.   Plaintiff's Response[3]

2    Plaintiff opposes Defendants' motion and asserts that remedies were not available to

3    him (Doc. 19).  In his response, he sets forth the following facts:

4    Plaintiff was stabbed on June 16, 2010, at the Rast Unit (id. at 2).  After the stabbing,

5    he was transported to the Maricopa County Hospital in Phoenix, where he received staples

6    in his chest (id. at 2).   After 9-10 hours at the hospital, he was transported to Complex

7    Medical at the Lewis Complex late at night.  The next morning, June 17, Plaintiff was

8    transported to SMU I (id.).

9    Upon his arrival at SMU I, Plaintiff began asking his CO III/case worker about the

10   stabbing incident; Plaintiff knew he was stabbed but did not know how it happened (id.).  For

11   the eight months that Plaintiff was housed at SMU I, he was repeatedly moved from one part

12   of the unit to another or from one unit to a completely different unit and, consequently, did

13   not have the same CO III/case worker for more than a month or two (id. at 2-3).  On the rare

14   occasions that Plaintiff was able to speak to a CO III, they repeatedly informed him that the

15   matter was under investigation, they did not know anything, and "you'll find out eventually"

16   (id. at 3).

17   The few times that Plaintiff submitted an inmate letter to his CO III/case worker, he

18   did not receive a response.  And because of budget shortages, ADC now utilizes Xerox

19   copies of the inmate letter form; thus, although the original forms contained canary-carbon

20   copies so that an inmate retained a copy of the grievance form, the one-page Xerox copy of

21   the form was submitted to the CO III and Plaintiff was not provided a copy (id.).

22   Plaintiff continued to try to find out anything he could, but due to his limited resources

23   and the fact that the incident was categorized as a "2A Investigation," he was never able to

24   obtain details of the incident (id.).  All he knew was that he was walking to the chowhall for

25   lunch, a melee ensued, and he was stabbed (id.).

26

27

28   [3]The Court issued the Notice required under Wyatt, 315 F.3d at 1120 n. 14, which
informed Plaintiff of his obligation to respond and the evidence necessary to successfully
rebut Defendants' contentions (Doc. 13).

On February 17, 2011, Plaintiff was transported to the Maricopa County Fourth Avenue Jail for court proceedings related to the stabbing incident (id.). Once he arrived at the county jail, he began to obtain detailed information about the incident (id. at 3-4). With the help of his criminal attorney, Plaintiff obtained the police report from the ADC investigation (id. at 4). Since March 15, 2011, Plaintiff has continued to receive additional reports from the ADC investigation; the last report was received in June 2012 (id., Ex. B).

Once he learned about the incident and alleged violations by Defendants, Plaintiff wrote to the ADC Eyman Complex a number of times inquiring about administrative remedies but received no response (id.). Plaintiff became concerned about the statute of limitations for filing a civil complaint, and he sought legal assistance from various sources, to no avail (id. at 5). Plaintiff has been out of ADC custody now for almost a year and half and does not know when he will be transported back.

Plaintiff contends that based on these facts, administrative remedies were not available to him (id. at 5-6). He argues that in their motion, Defendants fail to consider the unique circumstances in his case; namely, that he was unaware of the details of the subject incident due to his injury and he was not in the custody of ADC when he became aware of the incident (id. at 6-7). Plaintiff further argues that he is only required to exhaust remedies that are "available," i.e., accessible, present or ready for immediate use, or able to be obtained (id. at 7-8, citing cases).

Plaintiff points to that part of DO 802 that states "the following are not grievable . . . judicial proceeding" (id. at 8, citing DO 802.01 § 1.2). He maintains that his incident falls under "judicial proceeding" because there was a criminal investigation and ADC was not going to reveal any part of an investigation that would jeopardize their proceedings, which then led to court proceedings (id.).

Plaintiff further states that before he was transferred to the jail, he attempted to "informally resolve" his issue as required under DO 802; however, he "got nowhere," his inmate letters were unanswered, and he was told that he would find out eventually (id. at 8-9). Plaintiff argues that he was effectively precluded from pursuing a grievance and remedies

were not available (id. at 9-10).

The exhibits attached to Plaintiff's response include letters from his attorney stating that he has sent Plaintiff a copy of the police report in his case and a copy of the ADC Supplemental Report Number DR2010-100148 (id., Exs. A-B).

### C.   Defendants' Reply

In reply, Defendants assert that Plaintiff knew about the details of the stabbing incident because the day after the incident, he received an Inmate Disciplinary Report stating that he was charged with murder for involvement with the stabbing of another inmate (Doc. 21 at 2).  Defendants also state that Plaintiff was found guilty of this violation at a June 17, 2010 hearing (id.).  They submit copies of the Inmate Disciplinary Report notice and the Result of Disciplinary Hearing form (id., Ex. A, Exs. 1-2).  Defendants contend that Plaintiff had sufficient information to initiate the grievance process in the days after the incident, particularly because he is not required to name all of the potential defendants in his grievance (id. at 2-3).

Defendants also contend that Plaintiff's movements did not affect his ability to grieve his complaint and that he did not continually get moved around as he claims (id. at 3-5). They state that Plaintiff was housed in the SMU I Detention Unit and assigned to CO III Odom from June 17-August 22, 2010, at which time he was moved to SMU I Wing 3 and assigned to CO III Allen; thus, he had just two housing changes and two different CO IIIs (id. at 5).  Defendants note that to properly grieve his claim, Plaintiff had to initiate the grievance process with 10 days after the incident, and he had to file a formal grievance within 5 days after an unsatisfactory response to his informal complaint (id. at 3-4).  According to Defendants, there is no evidence Plaintiff attempted to comply with the grievance process while housed in SMU I from June 17 to August 22, 2010 (id.).  They also assert that if Plaintiff did not receive a response to an inmate letter, DO 802 provides that he may proceed to the next review level, and there is no evidence he attempted to do so (id.).

Defendants next argue that the 2A Investigation did not impact Plaintiff's ability to exhaust remedies because the investigation pertained to his disciplinary charge that resulted

1  from the June 16, 2010 incident (id. at 5).  They state that the disciplinary investigation was

2  separate and apart from the grievance procedure (id.).

3       Lastly, Defendants contend that Plaintiff's transfer to the county jail is not relevant

4  because he had sufficient time to exhaust remedies prior to his move to the jail (id. at 5-6).

5  **IV.  Analysis**

6       As stated, Defendants must demonstrate that remedies were available to Plaintiff.

7  Brown, 422 F.3d at 936-37.  If circumstances render administrative remedies "effectively

8  unavailable," the inmate is excused from the exhaustion requirement.  Nunez v. Duncan, 591

9  F.3d 1217, 1226 (9th Cir. 2010); see Brown v. Croak, 312 F.3d 109, 112 (3d Cir. 2002)

10  (administrative remedies unavailable where prison officials erroneously told the inmate he

11  must wait until an investigation was complete).

12       In response to Plaintiff's claim that he was unaware of the facts giving rise to the

13  stabbing incident and, therefore, could not grieve the failure-to-protect issue until months

14  later when he eventually learned the details, Defendants maintain that the Inmate

15  Disciplinary Report notice contained sufficient details of the incident for him to initiate the

16  grievance process.[4]  The notice, which states that it was delivered to Plaintiff at 10:45 am on

17  June 17, 2010 at the Lewis Rast Unit, provides the following facts:

18  > On 6/16/10 at approximately 1310 hours I CO II Cruz #8689 observed
19  > [Plaintiff] holding Inmate [redacted] by the arms to restrain him while Inmate
   > [redacted] stabbed Inmate [redacted] several times.  At approximately 1400
20  > hours Inmate [redacted] was pronounced dead due to his injuries. [Plaintiff]
   > was verbally placed on report by CO Wilcox on 7/17/10 at approximately 0910
21  > hours.   This report was written by CO II Crux #8689 on 6/17/10 at
   > approximately 1000 hours.

22  (Doc. 21, Ex. A, Ex. 1).  The notice includes Plaintiff's signature, and it references an

23  investigation with regard to felony violations (id.).

24  
_____

25      [4]This notice was submitted with Defendants' reply memorandum; thus, Plaintiff did
26  not have the opportunity to respond to it.  A court should not consider new evidence
   presented in a reply without giving the non-movant an opportunity to respond.  Provenz v.
27  Mill, 102 F.3d 1478, 1483 (9th Cir. 1996).  Dismissal of Defendants' motion without
   prejudice would therefore be appropriate without any further analysis. But because the Court
28  finds that the notice is not conclusive as to whether remedies were available to Plaintiff,
   Plaintiff is not prejudiced by the Court's consideration of the notice.

Although the notice provides facts indicating that Plaintiff was suspected as an accomplice in the stabbing of another inmate, it does not provide facts specifically related to Plaintiff's civil-rights claim.  That is, there are no facts about an inmate triggering the metal detector alarm earlier that day, nor are there facts concerning inmates on the recreation yard who were supposed to be separated and in lock down.  In his response, Plaintiff states that after his transfer to the county jail he began receiving reports from the ADC investigation about the stabbing incident, including audio and video recordings (Doc. 19 at 4).  Plaintiff referred to these recordings in his Complaint and supports his deliberate-indifference claim with the alleged admissions by Jackson and Reed in these audio recordings (Doc. 1 at 5-5A).  Defendants do not explain how the limited facts provided in the Inmate Disciplinary Report should have put Plaintiff on notice of a potential failure to act by staff in response to metal detector alarms or unauthorized inmates on the recreation yard.  Defendants nonetheless submit that Plaintiff was "well acquainted with the details" of the stabbing incident and could have grieved the issue (Doc. 21 at 2).  But to the extent that Plaintiff may have challenged ADC's version of the incident or the disciplinary charge against him, the evidence is clear that an appeal of that nature would have to be addressed through the separate Disciplinary Hearing Process (Doc. 21, Ex. A, McMorran Decl. ¶ 4).  Defendants do not indicate whether Plaintiff utilized the separate disciplinary process.  Moreover, the parties' dispute as to the what led to the stabbing goes to the merits of Plaintiff's claim, which is not addressed on an unenumerated motion to dismiss.  See Wyatt, 315 F.3d at 1119.

Arguably, Plaintiff could not exhaust remedies as to his claim that ADC staff was deliberately indifferent to known risk of harm until he obtained more details about the incident.  See Nunez, 591 F.3d at 1225 (exhaustion excused because the plaintiff "could not reasonably be expected to exhaust his administrative remedies without the [policy] that the Warden claims mandated the [challenged action], and because [the plaintiff] took reasonable and appropriate steps to obtain it").  Plaintiff therefore inquired of his assigned CO IIIs about the incident (Doc. 19 at 3).  Plaintiff's claim that the CO IIIs informed him that the matter

was under investigation and he would eventually find out what happened is not refuted by Defendants.  Indeed, Defendants identify the CO IIIs who were assigned to Plaintiff at SMU I—Odom and Allen—but do not present any sworn statements from these CO IIIs to rebut that they informed Plaintiff that the incident was under investigation (see Doc. 21 at 5).[5]

According to DO 802, Plaintiff's attempt to speak to the CO IIIs constitutes the first step in the grievance process (Doc. 12, Ex. A, Ex. 1, DO 802.02 § 1.1 ("[i]nmates shall attempt to resolve their complaints through informal means including, but not limited to discussion with staff . . . .")).   The CO IIIs' responses are evidence of whether relief was available to Plaintiff.  See Brown, 422 F.3d at 937 ("information provided the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available'") (citation omitted).  It was not unreasonable for Plaintiff to rely on the CO IIIs' averments that he had to wait until after the investigation to get the requested information. See Brown, 312 F.3d at 112.

Defendants dispute Plaintiff's claim that he could not obtain details of the incident because it was under investigation; however, they do not explain how else Plaintiff could have obtained the facts he alleges in his Complaint, given that those facts are not set forth in the Inmate Disciplinary Report (see Doc. 21 at 5).  This is not a situation like that in Harvey v. Jordan, where the plaintiff claimed that he lacked the necessary information to file a grievance on his excessive force claim until he learned the true origin of his injuries.  605 F.3d 681, 684 (9th Cir. 2010).  There, the Ninth Circuit held that the plaintiff could have filed an excessive-force grievance based on his statements that he knew *on the date of the incident* that there was no justification for the cell search, he did not refuse to comply with the search,

---

[5]Plaintiff was housed at SMU I Detention Unit from June 17 to August 22, 2010, and housed at SMU I Wing 3 from August 22 to October 10, 2010 (Doc. 21 at 5).  Defendants' evidence shows that on October 10, 2010, Plaintiff was transferred to the Browning Unit (Doc. 12, Ex. C, Riker Decl. ¶ 6).  Defendants do not indicate who Plaintiff's assigned CO III was during his confinement at the Browning Unit from October 2010 to February 2011.

and the pepper-spray grenade "nearly incapacitated" him when it was thrown into his cell. Id.  Here, there is no evidence Plaintiff knew—prior to receiving investigation reports in 2011—that on June 16, 2010, staff permitted unauthorized inmates on the recreation yard or allowed the inmate who stabbed him to go unchecked after triggering the metal detector alarm.  Consequently, the Court finds that remedies were not available to Plaintiff during the time he was told an investigation was ongoing.

The evidence shows Plaintiff did not obtain information from the ADC investigation until after his February 2011 transfer to the county jail (see Doc. 19 at 4).  Defendants do not demonstrate what remedies, if any, were available for Plaintiff to grieve his civil rights claim while housed at the jail.

For the above reasons, the Court finds that Defendants have not met their burden to demonstrate that administrative remedies were available to Plaintiff for the claims set forth in his Complaint.  The Motion to Dismiss will therefore be denied.

**IT IS ORDERED that** the reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion to Dismiss (Doc. 12), and the Motion is **denied**.

DATED this 11th day of September, 2012.

G. Murray Snow
United States District Judge

- 11 -